**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

ALL-TAG SECURITY AMERICAS, INC.          :
1155 Broken Sound Parkway                :
Unit E                                   :
Boca Raton, Florida 33487                :
                                         :
                        Plaintiff,       :          C.A. No.: _____
                                         :
            v.                           :
                                         :          JURY TRIAL DEMANDED
CHECKPOINT SYTEMS, INC.                  :
101 Wolf Drive                           :
Thorofare, New Jersey 08086              :
                                         :
                        Defendant.       :
_____     :

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, All-Tag Security Americas, Inc. ("All-Tag"), brings this complaint against

Defendant, Checkpoint Systems, Inc. ("Checkpoint"), and alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for infringement of U.S. Patent No. 7,495,566 ("'566 Patent"),

under Title 35 of the United States Code.

### THE PARTIES

2.      All-Tag is a Florida corporation, having its principal place of business at 1155

Broken Sound Parkway, Unit E, Boca Raton, Florida 33487.  All-Tag is involved in the

manufacture and distribution of anti-shoplifting security devices, and is the exclusive licensee of

the '566 Patent.

3.      Checkpoint is a Pennsylvania corporation, having its principal place of business at

101 Wolf Drive, Thorofare, New Jersey 08086.  Checkpoint is also involved in the manufacture

and distribution of anti-shoplifting security devices, and directly competes with All-Tag, among other competitors.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), as well as 28 U.S.C. § 2201.

5.      This Court has personal jurisdiction over Checkpoint, as Checkpoint regularly does business and derives substantial revenues in the State of Florida and in this judicial district, including with respect to the subject matter of this dispute.  Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).  Checkpoint maintains a regular and established place of business, and has committed acts of infringement arising out of its contacts, in this judicial district.

## FACTUAL BACKGOUND

6.      A number of different security devices are available in the anti-shoplifting market, including both reusable and non-reusable devices.  Reusable devices are generally used with higher-end clothing.  They are attached to the garment and removed at the check-out counter. Non-reusable devise are much smaller, typically the size of a postage stamp, and are glued, sewn, or otherwise placed in or on the product.  Non-reusable devices are also deactivated at the check-out counter but remain with the product.  The patent-in-suit and the accused infringing product involve  non-reusable devices.

7.      The accused infringing device is referred to in the industry as a "resonance security tag" and is used in conjunction with detectors placed at the exits of the retail establishment.  Collectively, the tag and detectors are referred to as an "electronic article surveillance system" ("EAS System").  These resonance security tags are produced on a

dielectric foil material with conductive layer patterns on both sides of the foil.  They form a

resonance circuit with an appropriate resonance frequency to be detected by the detectors at the

exit doors.

8.      Prior to the invention in this case, resonance security tags were manufactured, cut,

and folded in a particular way.  The dielectric foil has a conductive pattern printed on both sides

but one is an inductor coil.  Prior approaches folded the tag onto the inductor side and the

resulting product had considerable variance in resonance frequency and reduced detection rates.

The present invention includes improvements in which the tags are folded to the side opposite

the side on which the inductor pattern is printed and the tags incorporate a shielding plate.

Manufacturing costs are the same or lower and detection rates are much higher.

9.      Poul Richter Jorgensen of Denmark invented this improved resonance security

tag.  He was issued the '566 Patent, on February 24, 2009.  Mr. Jorgensen has licensed all

substantial rights in the '566 Patent exclusively to All-Tag, and All-Tag has the right to exclusive

right to enforce the '566 patent against infringers.  A true and correct copy of the "Agreement"

and "First Amendment to License Agreement" are collectively attached hereto and made a part

hereof as Exhibit "A."

10.      Compared to Checkpoint and other competitors in the industry, All-Tag is a

relatively new entrant, with substantially lower sales and revenues.  With its acquisition of the

exclusive license to the '566 Patent and the reconfiguration of its manufacturing processes to

practice the '566 Patent, All-Tag has grown quickly due to its superior detection rates.

11.      Recently, All-Tag learned that Checkpoint has copied its technology and is now

marketing a resonance security tag that infringes the '566 Patent, calling it the "Micro EP EST

PST label" ("Micro Tag").  Checkpoint has begun selling this infringing Micro Tag to All-Tag's

customers, resulting in significant lost profits and damages to All-Tag as a direct result of Checkpoint's infringement. In particular, Checkpoint recently entered into a contract with one of All-Tag's customers worth over $50,000,000, a sale that would have gone to All-Tag but for the infringement.

12.     All-Tag has attempted to resolve this dispute amicably. During the past year, All-Tag, through counsel, has requested, on a number of occasions, that Checkpoint stop infringing. Each demand has been met with a different excuse. Initially, Checkpoint denied that it practices a certain element of the '566 Patent and took the position that it was merely practicing the prior art. After All-Tag showed that it was not, Checkpoint then argued that this invention had actually been disclosed in an earlier Japanese patent. After All-Tag pointed out that this Japanese patent was disclosed to the U.S. Patent and Trademark Office, and that the '566 Patent was granted over this Japanese reference, Checkpoint's position changed again. Checkpoint now argues that the '566 Patent is invalid because it was obvious and anticipated by the prior art. Checkpoint no longer takes the position that its Micro Tag does not infringe the '566 Patent. Checkpoint's constantly changing position evidences its bad faith and the deliberate nature of Checkpoint's infringement.

13.     Checkpoint's conduct in this matter, including its blatant copying of the '566 Patent, its refusal to stop infringing, its solicitation of All-Tag's customers with its infringing product, and its myriad, ever-changing excuses, provides ample evidence of Checkpoint's willful infringement of the '566 Patent, making this case exceptional under 35 U.S.C. § 285.

**FIRST CAUSE OF ACTION**
**INFRINGEMENT OF U.S. PATENT NO. 7,495,566**

14.     All-Tag realleges and incorporates by reference each of paragraphs 1-13 above, as if fully set forth herein.

15.     On February 24, 2009, the United States Patent and Trademark Office duly and lawfully issued U.S. Patent No. 7,495,566, entitled "RESONANCE SECURITY TAG WITH AND METHOD OF PRODUCING SUCH A TAG."  A true and correct copy of the '566 Patent is attached hereto and made a part hereof as Exhibit "B."

16.     All-Tag is the owner of the '566 Patent and has the exclusive right to make, use, import, offer for sale, sell in the United States and export products covered by the '566 Patent.

17.     All-Tag has the exclusive right to institute suit in the United States for past, present and future damages for infringement of the '566 Patent.

18.     All-Tag has the right to sublicense and assign the '566 Patent.

19.     Checkpoint has been making, using, selling and/or offering for sale resonance security tags, including without limitation the Micro Tag, that infringes one or more claims of the '566 Patent.

20.     Checkpoint's infringement will continue unless and until enjoined by this Court.

21.     Checkpoint's infringement has caused All-Tag substantial and irreparable injury and damages in an as-yet-undetermined amount and, unless and until enjoined by this Court, will continue to do so.

22.     All-Tag gave Checkpoint notice of infringement on March 8, 2013, May 7, 2013, July 31, 2013, November 7, 2013 and July 31, 2014, and Checkpoint has continued to infringe in spite of these notices.  At all times, Checkpoint was committing acts of infringement which have been and continue to be willful and deliberate.

### PRAYER FOR RELIEF

**WHEREFORE,** All-Tag respectfully requests the following relief:

A.      entry of judgment that Checkpoint infringes one or more claims of the '566 Patent;

B.      issuance of a permanent injunction enjoining Checkpoint, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from further infringement of the '566 Patent;

C.      entry of judgment awarding All-Tag compensatory damages for Checkpoint's infringement of the '566 Patent;

D.      entry of judgment that Checkpoint's infringement of the '566 Patent was deliberate and willful;

E.      entry of judgment awarding All-Tag enhanced damages, up to three times the amount of compensatory damages pursuant to 35 U.S.C. § 284;

F.      entry of judgment awarding All-Tag pre- and post-judgment interest on its damages, together with its costs and expenses;

G.      entry of judgment awarding All-Tag reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and for such other relief as this Court may deem just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.**

Dated:  October ___, 2014

Respectfully Submitted,
**STRAUS & EISLER**


/s/ Michael Eisler
MICHAEL EISLER (Fla. Bar No. 500615)
meisler@strauseisler.com
2500 Weston Road, Suite 213
Weston, FL 33331
(954) 349-9400

*Of Counsel:*


/s/ John B. Williams
JOHN B. WILLIAMS (D.C. Bar No. 257667)
jbwilliams@williamslopatto.com
WILLIAMS LOPATTO, PLLC
1776 K Street, N.W.
Washington, D.C. 2006
(202) 296-1611

PATRICK COYNE
patrick.coyne@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
GARRET & DUNNER, L.L.P
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000

# Exhibit "A"

CONFIDENTIAL

# AGREEMENT

Between

All-Tag Security Americas, Inc., a Florida corporation, located at 1155 Broken Sound Parkway, Unit E, Boca Raton, FL 33487, U.S.A. represented by its President Stuart Seidel

And

1. Richter Joergensen & Co. ApS, with headquarters at Saugskaersvej 18, DK-5700 Svendborg, Denmark, represented by Poul Richter Joergensen, Managing Director,
2. Poul Richter Joergensen, Saugskaersvej 18, DK-5700 Svendborg, Denmark,

hereinafter jointly referred to as "PRJ".

Whereas

1. PRJ engages in the business of technical consultancy in Electronic Articles Surveillance system (hereinafter "EAS").
2. All-Tag engages in the manufacturing and marketing of radio frequency anti-theft labels (hereinafter "the label" or "the labels"), a business field known as EAS.
3. PRJ has developed and patented a technical concept, reference no. BT/AP/117017 (hereinafter referred to as "117017", copied in appendix 1 to this agreement) which may result in improvement of the technical performance of All-Tag's EAS labels, provided that various production and marketing tests be passed successfully.
4. The parties wish that All-Tag enters into an exclusive sales and production licence agreement in accordance with the newly patented 117017 technology in exchange for royalty payments in favour of PRJ.
5. PRJ and All-Tag wish to extend their cooperation with respect to possible future EAS inventions by PRJ within the field of EAS labels.

The following has been agreed:

## Article 1
PRJ gives to All-Tag, and All-Tag accepts, the exclusive licence right to manufacture, and to sell EAS labels using the patent 117017.

## Article 2
In case PRJ files for other EAS label patent(s) in the future, All-Tag will automatically have the right of first refusal to become the exclusive production and sales licensee, subject only to the parties agreeing on a royalty fee per unit produced and sold (hereinafter referred to as "the royalty fee"). In case the parties do not agree on such a fee, PRJ will be free to enter into a licence agreement with a third party in exchange for a royalty fee higher than the one proposed by All-Tag.

CONFIDENTIAL

**Article 3**

In return for the exclusive licence right as described in article 1 hereof, All-Tag agrees to pay all renewal fees and shall maintain in force the patent during this agreement, as well as paying to PRJ a royalty fee of '          for each label sold under this licence agreement. Payment of royalties must take place quarterly latest within the month following the end of each quarter, i.e. on April 31st, July 31st, October 31st, and January 31st.

The minimum quaterly fee payable by All-Tag to PRJ will of             'thereafter.

However, if the development period of the new 117017 label happens to be materially longer than the 18 months currently anticipated, the parties hereby agree to lengthen this eighteen months period accordingly.

**Article 4**

All-Tag's above payment obligations are conditional upon a thorough professional verification of the international validity of such patents by the office of Mr. George Werner (or another reputable patent expert to be chosen by All-tag).

**Article 5**

In the event of the patent or any proprietary right / intellectual property right concerning the EAS labels being infringed or challenged, All-Tag shall at its own expense take all legal proceedings necessary to stop such infringement or defend such proceedings, on a "best efforts" basis. PRJ undertakes to provide all reasonable assistance to All-Tag. Upon written demand of PRJ, All-Tag shall pay to PRJ all expenses and costs incurred by PRJ in rendering assistance. All-Tag shall in advance secure all liability whether contingent or actual of PRJ in connection with the infringement or legal proceedings or abandoning its licence right.

**Article 6**

Neither party shall be entitled to assign or transfer any rights or obligations being subject of this agreement or any benefits arising from the agreement, without the consent of the other party. Licences granted to All-Tag shall not be sub-licensed. All-Tag shall keep confidential all know-how and information provided by PRJ.

**Article 7**

If market prices for the 117017 labels are, or develop, in such a way that the magnitude of the licence fee renders the project marginally profitable or non-economical, the royalty fee to PRJ can be reduced by the same percentage as All-Tag's profit margin for the EAS labels (article 7 is not valid for individual sales). The licence fee can never be less in

**Article 8**

If for any reasons All-Tag decides not to pay the maintenance fee, All-Tag must inform PRJ in writing of its intentions to stop payment in due time to allow PRJ to protect the patent rights. At that time, All-Tag will loose any right under this agreement concerning the patent, for which payment has stopped. However, All-Tag's right over other patent, if any, will not be affected.

**Article 9**

Once All-Tag relinquishes its licence right over a given patent, PRJ will be free to dispose of the patent in question, as he deems appropriate.

*P.R.J*

*55*

REDACTED

CONFIDENTIAL

**Article 10**

Any non-compliance by All-Tag or by PRJ to fulfil any of their obligations under this agreement shall constitute a breach of this agreement. In such case, the non-defaulting party will have the right to give notice of such non-compliance to the defaulting party, and the defaulting party will from that time have 60 days to remedy said default. If at that time the default is not remedied, either party may bring the case to a court of justice that will decide on the damages due to the non-defaulting party, in addition to other penalties as per this agreement.

**Article 11**

In case of a persisting default by All-Tag over a payment obligation, the parties agree that PRJ will recoup all rights over the affected patent(s), and All-Tag will consequently loose all rights concerning said patent(s). Other patents, if any, will not be affected inasmuch as All-Tag's obligations concerning such patent are met.

**Article 12**

In case of a breach, proven in the court, caused by PRJ and notwithstanding the above, All-Tag will be entitled to discontinue royalty payments to PRJ for a period of twenty four months.

**Article 13**

This agreement may be terminated by any party in case the other party becomes insolvent, and/or goes into liquidation, unless royalty payments are still met in accordance with this agreement.

**Article 14**

This agreement shall remain in affect as long as the patent(s) remain valid internationally, and as long as payment obligations are met by All-Tag.

**Article 15**

Disputes or differences between the parties concerning this agreement shall be decided under the law of Denmark, by The Maritime and Commercial Court (Sø- og Handelsretten) in Copenhagen, using the English language.

**Article 16**

In any legal proceeding, the parties agree that they will not enforce against any other law or regulation which allows the party to be treated in any other manner less favourably than if the party had been resident in the jurisdiction, or which requires the party to provide financial security for the claim or cost.

**Article 17**

This agreement entered into force on June 1st 2013.

Executed          3 (three) originals, this  4  of  June, 2013

All-Tag Security Americas
Represented by
Stuart Seidel

                                        P.R. Joergensen

                                        Richter Joergensen & Co
                                        Represented by
                                        P.R. Joergensen

# FIRST AMENDMENT TO

## LICENSE AGREEMENT

**CONFIDENTIAL**

THIS FIRST AMENDMENT, effective *nunc pro tunc* from 4 June, 2013, ("Effective Date"), is by and between All-Tag Corporation (formerly ALL-Tag Security Americas, Inc.), a Florida corporation, located at 1155 Broken Sound Parkway, Unit E, Boca Raton, Florida, USA ("All-Tag"), and Richter Jorgensen & Co., ApS, a Danish Corporation, located at 18, DK-5700 Svendborg, Denmark, and Poul Richter Jorgensen, a Danish citizen, Saugskaersvej 16, DK-5700 Svendborg, Denmark (collectively "PRJ"). WHEREAS, All-Tag and PRJ are parties to an Agreement dated 4 June, 2013, between All-Tag and JPR;

WHEREAS, Poul Richter Jorgensen is the owner of U.S. Patent No. 7,495,566 ("Licensed Patent) and has licensed exclusively to All-Tag all rights to the subject matter disclosed and claimed, in all patents and applications in all countries, in reference no. BT/AP/117017, by the Agreement dated 4 June, 2013. The Licensed Patent is used to manufacture Radio Frequency antennas for the anti-shoplifting industry and is referred to as the subject matter in this Amendment;

WHEREAS, All-Tag's rights in the Licensed Patent have been challenged by a third party and All-Tag and PRJ desire to make clear that the exclusive rights that Poul Richter Jorgensen has licensed to All-Tag in the 4 June 2013 Agreement include all of the rights in U.S. Patent No. 7,495,566;

NOW, THEREFORE, in consideration for the mutual promises, covenants, terms and conditions herein, the receipt and sufficiency of which are hereby acknowledged, and with the intention to be legally bound hereby, the parties agree as follows:

1.   Poul Richter Jorgensen grants to All-Tag an exclusive license to exercise all rights to the '566 patent, including without limitation the right to make, use, sell, offer for sale, and import into the United States the subject matter of the Licensed Patents in the United States, its territories and possessions ("Licensed Territory"), while for the life of the Licensed Patent.

2.   Poul Richter Jorgensen grants All-Tag the right to grant sublicenses in the Licensed Territory, subject only to advance written notice to PRJ of the terms of any such sublicense not less than thirty (30) days prior to agreement with the prospective sublicensee. If All-Tag decides to sublicense the Licensed Patent, All-Tag shall pay PRJ upon the sublicensing,                 , multiplied by the number of months remaining in the life of the Licensed Patent, in lieu of any other compensation provided by this Agreement and Amendment.

**REDACTED**

#134059v3

CONFIDENTIAL

3.   All-Tag may assign this Agreement and the license granted herein in conjunction with sale of the business associated with performance under this Agreement. All-Tag may assign any or all of its rights to the Licensed Patent in the Licensed Territory, subject only to giving advance written notice to PRJ of the terms of any such Assignment not less than thirty (30) days prior to agreement with the prospective assignee. If All-Tag decides to assign the Licensed Patent, All-Tag shall pay PRJ upon the assigning, multiplied by the number of months remaining in the life of the Licensed Patent, in lieu of any other compensation provided by this Agreement and Amendment.

4.   All-Tag may export products covered by the Licensed Patent from the Licensed Territory.

5.   Each party will promptly notify the other of any suspected infringement of a Licensed Patent in the Licensed Territory.  All-Tag shall have the right, but not the obligation, to rectify any such infringement by sublicense or by instituting suit for infringement.  All-Tag shall have the sole right to sue for and to recover past, present, and future damages for any such infringement in the Licensed Territory. All-Tag's right to recover for past infringement shall include the right to recover damages for any infringement, including without limitation, infringement prior to the Effective Date of this First Amendment and/or the 4 June, 2013, Agreement. PRJ shall cooperate, within Denmark,  with All-Tag in any such suit, unless the Licensed Patents have been sublicensed or if the All-Tag business has been sold. PRJ will notify All-Tag of any expenses that will be incurred by PRJ pursuant to this paragraph prior to incurring them, and will be reimbursed by All-Tag for reasonable and necessary expenses incurred by PRJ in connection with such cooperation. Any award of damages or lost profits as a result of such suit shall be retained solely by All-Tag.

6.   The royalty fee will be          per month and shall be paid the fourth open day each month for the life of the License agreement. Licensee will be notified in writing of any past due payment and given 20 days from receipt of the notification to make payment.

7.   Except as expressly modified by the terms of this First Amendment, the terms of the parties' 4 June, 2013 Agreement shall continue in full force and effect.

8.   Each party hereby agrees to execute any and all documents and instruments reasonably necessary to implement the provisions of this Agreement.

     IN WITNESS WHEREOF, each party hereto has caused this Agreement to be executed by a duly authorized officer on the dates specified below.

                              REDACTED

#134059v3



Stuart Seidel
All-Tag Security Americas, Inc.
1155 Broken Sound Parkway
Unit E
Boca Raton, Florida 33487

By _____
Name _Stuart T. Seidel_
Title _President_

Date _October 1, 2014_        *Denmark*

Poul Richter Jorgensen
Saugskaersvej 16
DK-5700
Sevenborg, Denmark

By _P. R. Jorge_
Name _Poul Richter Jorgensen_
Title _Director_

Date _Thurs 01.10.2014_

Richter Jorgensen & Co., ApS
18, DK-5700
Svendborg, Denmark

By _P. R. Jorge_
Name _Richter Jorgensen og Co ApS_
Title _Director_

*Denmark*        Date _Thurs 01.10.2014_

#134059v3

# Exhibit "B"



US007495566B2

## (12) United States Patent
### Jorgensen

(10) Patent No.:     US 7,495,566 B2
(45) Date of Patent:          Feb. 24, 2009

(54) **RESONANCE SECURITY TAG WITH AND METHOD OF PRODUCING SUCH A TAG**

(76) Inventor:   **Poul Richter Jorgensen**, Saugskærvej 16, Thurø, DK-5700, Svendborg (DK)

( * ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 31 days.

(21) Appl. No.:   **10/582,771**

(22) PCT Filed:   **Dec. 16, 2004**

(86) PCT No.:   **PCT/DK2004/000876**

§ 371 (c)(1),
(2), (4) Date:   **Jun. 13, 2006**

(87) PCT Pub. No.:   **WO2005/059855**

PCT Pub. Date:   **Jun. 30, 2005**

(65)        **Prior Publication Data**

US 2007/0120680 A1      May 31, 2007

(30)      **Foreign Application Priority Data**

Dec. 16, 2003    (DK) ................................ 2003 01862

(51) Int. Cl.
*G08B 13/14*        (2006.01)
(52) U.S. Cl. ............. **340/572.7**; 340/572.1; 340/572.5; 340/572.8; 336/200
(58) Field of Classification Search ............. 340/572.5, 340/572.1, 572.7, 572.8; 336/200
See application file for complete search history.

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| 4,598,276 | A | * | 7/1986 | Tait | ........................ | 340/572.5 |
| 6,097,291 | A | * | 8/2000 | Tsai et al. | ................ | 340/572.6 |

FOREIGN PATENT DOCUMENTS

| DE | 36 02 848 | A |   | 8/1987 |
| JP | 02-310696 | A |   | 12/1990 |
| JP | 07-160959 | A |   | 6/1995 |
| JP | 7160959 |   | * | 6/1995 |

* cited by examiner

*Primary Examiner*—Benjamin C Lee
*Assistant Examiner*—Hongmin Fan
(74) *Attorney, Agent, or Firm*—Breiner & Breiner, LLC

(57)        **ABSTRACT**

A resonance security tag (1) comprises a dielectric foil material (2) provided with conductive material layer patterns (3-7) on both sides. The conductive material layer patterns are formed to provide an inductor (3) and a capacitor (4, 6) positioned inside the inductor (3), and mutually connected to form a resonance circuit. By cutting (9) the capacitor (4, 6) free of the dielectric foil material (2) and folding the capacitor (4, 6) away from the position inside the inductor (3), this part is left free for the penetration of magnetic flux through the inductor (3), whereby the detection level is improved and a possibility of reducing the size of the resonance security tag is provided.

**9 Claims, 4 Drawing Sheets**





FIG 1



FIG 2



Fig.3.



Fig.4.



*Fig. 5.*



*Fig. 6.*



*Fig. 7.*



*Fig. 8.*

US 7,495,566 B2

1

## RESONANCE SECURITY TAG WITH AND METHOD OF PRODUCING SUCH A TAG

### TECHNICAL FIELD

The present invention relates to a resonance security tag of the kind set forth in the preamble of claim 1 and a method of producing such a tag.

### BACKGROUND ART

Resonance security tags of this kind are e.g. known to be used in electronic article surveillance systems (EAS systems) in order to detect unauthorised removal of articles from shops, stores or warehouses, and such resonance security tags are produced in large numbers on a dielectric foil material which is provided with conductive material layer patterns on both sides for forming an inductor and a capacitor forming a resonance circuit having a suitable resonance frequency and to be detected by means of suitable equipment positioned at the exit from the premises. A resonance security tag of this kind is e.g. known from EP-0,285,559.

From JP 02-310696 it is known to cut the foil material along part of the circumference of the capacitor elements and fold the cut-free capacitor away from inside the inductor in order to leave this part free for the penetration of magnetic flux through the inductor. However, experiments with this type of EAS-tag have shown a considerable variance in resonance frequency leading to reduced detection rates for such tags, and the present inventor has not seen any EAS-tags on the market which are produced in accordance with the method described in JP-02-310696.

### DISCLOSURE OF THE INVENTION

It is the object of the present invention to provide a resonance security tag of the kind referred to above, with which it is possible to improve the detection level, maintain a precise resonance frequency, and at the same time possibly reducing or maintaining the small size of the resonance security tag, and this object is achieved with a resonance security tag of the kind, which according to the present invention also comprises the features set forth in the characterising clause of claim 1. With this arrangement, the central part of the inductor is made free in order to allow penetration of the magnetic flux through the inductor, whereby a higher detection rate is achieved, and the resonance frequency is maintained within narrow limits despite the folding operation due to the folding being performed to the side opposite the inductor pattern and presence of a shielding plate having a form and size corresponding to the form and size of the folded over capacitor plates improving the frequency precision. Furthermore, the present invention relates to a method of producing such a tag.

Preferred embodiments of the resonance security tag in accordance with the present invention, the advantages of which will be evident from the following description, are revealed in the subordinate claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

In the following detailed part of the present description, the invention will be explained in more detail with reference to the exemplary embodiments of a resonance security tag according to the invention shown in the drawings, in which

FIG. 1 schematically shows a tag positioned between a transmitter and a receiver at the exit from the store or like for detecting the presence of the tag at the exit,

2

FIG. 2 schematically shows an equivalent circuit diagram of the situation shown in FIG. 1 for explaining the parameters for improving the detection level,

FIG. 3 shows the conductive material layer pattern on a first side of the dielectric foil material of a resonance security tag in accordance with the present invention,

FIG. 4 shows the conductive material layer pattern on both sides of the dielectric foil material of a resonance security tag in accordance with the present invention,

FIG. 5 shows schematically in a perspective view a partially folded cut free capacitor of a resonance security tag in accordance with FIGS. 3 and 4,

FIG. 6 shows the resonance security tag of FIG. 5 with the capacitor in a completely folded position,

FIG. 7 schematically shows suggested instruments for performing the folding of the capacitor, and

FIG. 8 shows an alternative embodiment of the resonance security tag specially formed to be positioned on or inside a CD or DVD in accordance with a preferred embodiment of the present invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to FIGS. 1 and 2, the quality of a resonance security tag is discussed in the following. In FIGS. 1 and 2, the tag 1 is positioned between a transmitter Tx in an electronic article surveillance system (EAS system), and a receiver Rx of said system. The transmitter transmits a radio frequency signal within a specific frequency range and whenever a tag with at resonance frequency within this range is within the range of the transmitter and the receiver, the receiver will be able to detect the resonance frequency of the tag.

The detection rate or quality will be dependent on the Q-value of the resonance circuit and the physical size thereof. The formula

$$Q = \frac{1}{r}\sqrt{\frac{L}{C}} \qquad (1)$$

indicates that in order to obtain a high Q-value, it is desired to have a small value of r, a high value of L and a small value of C. A low value of r can be obtained by choosing a conductive material layer in the tag like e.g. silver and a high value of L can be obtained by providing several windings in the inductor and at the same time the capacitor can be chosen with a small capacitance C.

In practice, however, this is not how it is done due to the fact that the price of silver is too high and many windings of the inductor coil will demand more material and surface area for the tag, which would increase the price of the tag. Furthermore, if many small windings are chosen in order to save material costs for the conductive material layer, the value of r will increase. If a very small value of C of e.g. 10 pF is chosen, the resonance circuit will be sensitive to external influence such as stray capacities, which would change the resonance frequency.

As can be seen from the above, the design of the resonance circuit for an EAS system is a compromise between price and size, among other things. In the market there is a wish for a cheap tag as well as a small tag with a high rate of detection and Q-value. Accordingly, the resonance circuit normally comprises a dielectric foil material 2 of polypropylene or

US 7,495,566 B2

3

polyethylene provided with an electrically conductive material layer pattern on both sides, said conductive material usually being of aluminium.

The electrical equivalent diagram shown in FIG. 2 corresponds in principle to an EAS system and the mutual induction coefficients between the inductors L1, L2 and L3 are M12 and M23, respectively. The loss resistance in the resonance circuit in the tag is represented by r. The input resistance in the measuring circuit is represented by R. The measured voltage Vm represents the signal strength from the resonance security tag. The resonance circuit L2,r,C is positioned between the transmitter coil L1 and the receiver coil L3. The formula for the received signal strength Vm is

$$Vm = \omega_0 (M12 \cdot M23 / L1) \cdot \frac{V1}{r} \qquad (2)$$

where $\omega_0$ is equal to 2 $\pi$ $f_0$ ($f_0$ is the resonance frequency). V1 is the voltage of the signal generator. When the coils L1, L2 and L3 (the cross-section S1, S3>S2) are arranged as shown, the mutual inductances are

$$M12 = K12 \sqrt{S2} \; L2 \text{ and } M23 = K23 \sqrt{S2} \; L2 \qquad (3),$$

where K12 and K23 are constants. Using (2) and (3), we have:

$$Vm = K12 \; K23 \; (V1/L1) \; (\omega_0 L2/r) S2 = K*Q*S \qquad (4)$$

K is a constant and Q is a measure for the quality of the resonance circuit

$$Q = \frac{1}{r} \sqrt{\frac{L}{C}}$$

S is the area surrounded by the magnetic flux. From the above it can be seen that Vm is proportional to Q*S.

In order to improve the tag, it is possible to increase Q or S or both.

The magnetic flux, which has to pass through the centre of the coil, is partially blocked by the capacitor in this position in a normal tag, referring to FIGS. 3 and 4. In order to increase the magnetic flux through the coil centre, it is desired to make the area of the capacitor as small as possible. As mentioned earlier, a certain minimum size of the capacitor is given, which leads to a restriction of the area in the centre of the coil which is free to allow the magnetic flux through the coil. The present invention removes the capacitor from the centre of the coil, whereby the magnetic flux through the coil centre is increased and thus the detection rate for the EAS system is increased considerably.

In FIG. 3 is shown the conductive material layer pattern on the first side of the dielectric foil material 2, which is formed to provide an inductor 3, a first capacitor plate 4 connected to a first end of the inductor 3 and positioned inside the inductor 3, and a first connection element 5 connected to an opposite end of the inductor 3. In FIG. 4 the conductive material layer pattern on the second, opposite side of the dielectric foil material 2 is shown superposed on the pattern of FIG. 3. The conductive material layer pattern on the second side of the dielectric foil material 2 is formed to provide a second capacitor plate 6 confronting the first capacitor plate 4 and a shielding plate 7 connected to the capacitor plate 6 and confronting the first connection element 5. The shielding plate 7 provides a patch of conductive material layer with a form and size corresponding to the form and size of the first and second capacitor plate 4, 6.

4

As shown schematically in FIG. 5, the capacitor plates 4, 6 have been cut 9 along part of the circumference of the first and second capacitor plates 4, 6 in order to fold the capacitor 4, 6 away from the central position inside the inductor 3. As shown in FIG. 6, the cut-free capacitor 4, 6 is folded completely along the folding line 10 over to overlay the shielding plate 7.

Due to the fact that the capacitive coupling between the shielding plate 7 and the windings of the inductor 3 is constant, the folding of the capacitor 4, 6 to overlay the shielding plate 7 will result in a well defined controlled change in resonance frequency. The distance between the folded over capacitor 4, 6 and the shielding plate 7 is precisely fixed.

In order to compensate for possible mechanical tolerances in the folding of the capacitor, the shielding plate 7 is preferably provided with dimensions larger than the capacitor plates 4, 6 such that the folded over capacitor plates 4,6 will always be positioned inside the circumference of the shielding plate 7.

The electrical contact 8 between the first connection element 5 and the shielding plate 7 is preferably provided by irregular holes through the dielectric foil material 2 in the area of these elements 5, 7 before or after the folding of the capacitor plates 4, 6.

The cut 9 along part of the circumference of the first and second capacitor plates 4, 6 can be provided by mechanical means, by laser cutting, by heating the capacitor plates 4, 6, etc. The first part of the folding of the capacitor 4, 6 may be provided by mechanical means or by means of a jet of air, etc. An example of mechanical means for providing the folding of the capacitor 4, 6 is shown in FIG. 7, in which a folding tool 12 is positioned stationary over the foil material 2 and the foil material is moved towards this folding tool which folds the turned up capacitor 4, 6. In order to move the folded capacitor 4, 6 into intimate contact with the shielding plate 7 on the upper side of the tag, a further roller-formed tool 13 is positioned immediately after the folding tool 12 seen in the movement direction of the foil 2.

The tag in accordance with the present invention is especially suited to be used as an EAS tag for a CD or DVD due to the fact that the hole in the middle can be positioned over the hole in the CD or DVD and the coil can be positioned so as to surround this hole in a position in which the CD or DVD has no metallic layer and thus allows the radio frequency field to pass through the area where the tag is positioned. This would not have been possible with a conventional tag due to the fact that a tag of this small size would not be detectable in an EAS system when the tag is produced in accordance with the conventional technique.

The tag in accordance with the present invention can, as shown in FIG. 8, be positioned centrally in a CD or DVD and may be integrated into the DVD between the layers of the DVD. In this situation the EAS tag cannot be removed without destroying the DVD.

The construction in accordance with the present invention has improved the specifications of the resonance circuit to an extent that allows a 10-20% reduction in the size of the resonance circuit. Due to the fact that material costs are the main costs in producing such tags, this reduction in size leads to a corresponding reduction in price for the tags.

Above, the invention has been described in connection with preferred embodiments thereof, however, many modifications may be envisaged by a person skilled in the art without departing from the scope of the following claims.

The invention claimed is:

1. Resonance security tag comprising a dielectric foil material provided with a conductive material layer pattern on a first

US 7,495,566 B2

5

side and a second side of said dielectric foil material, said conductive material layer pattern on the first side of the dielectric foil material being formed to provide an inductor, a first capacitor plate being connected to a first end of the inductor and

positioned inside the inductor, and a first connection element connected to an opposite second end of the inductor, the conductive material layer pattern on the second side of the dielectric foil material being formed to provide a second capacitor plate confronting the first capacitor plate and a second connection element, formed to provide an electrical shielding plate, connected to the second capacitor plate and confronting the first connection element, the first connection element and the second connection element being electrically connected, and the dielectric foil material being cut along part of a circumference of the first capacitor plate and the second capacitor plate to provide a cut-free capacitor which is folded away from a position inside the inductor, thus leaving such part free for penetration of magnetic flux through the inductor, wherein the cut-free capacitor is folded to the second side of the dielectric foil material to provide a folded-over capacitor overlaying the shielding plate and extending across a section of said inductor.

2. Resonance security tag in accordance with claim 1, wherein the shielding plate has a form and size corresponding to form and size of the folded-over capacitor.

3. Resonance security tag in accordance with claim 1, wherein each conductive material layer pattern is formed in such a way that the tag can be positioned on or inside a CD or DVD with a hole from the folded-over capacitor positioned around a central hole in the CD or DVD.

4. Resonance security tag in accordance with claim 2, wherein each conductive material layer pattern is formed in such a way that the tag can be positioned on or inside a CD or DVD with a hole from the folded-over capacitor positioned around a central hole in the CD or DVD.

5. Method of producing a resonance security tag in accordance with claim 1, said method comprising steps of providing the dielectric foil material with the conductive material layer pattern on the first side and the second side thereof, each said conductive material layer pattern being formed to provide the inductor and the first capacitor plate and the second capacitor plate forming a resonance circuit with the first capacitor plate and the second capacitor plate positioned inside the inductor, and further comprising a step of cutting the dielectric foil material along part of a circumference of the first capacitor plate and the second capacitor plate to provide a cut-free capacitor and folding the cut-free capacitor away from a position inside the inductor, thus leaving such part free for penetration of magnetic flux through the inductor, wherein the folding is performed to fold the cut-free capacitor to that side of the tag opposite that side on which the conductive material layer pattern is formed to provide the inductor.

6. Method in accordance with claim 5, wherein the folding is performed by producing a preliminary folding using a jet of

6

air or mechanical means to turn up the cut-free capacitor, and followed by passage of the security tag past a folding tool and a roller, whereby the capacitor is completely folded and pressed into intimate contact with a surface of the resonance security tag.

7. Method of producing a resonance security tag in accordance with claim 2, said method comprising steps of providing the dielectric foil material with the conductive material layer pattern on the first side and the second side thereof, each said conductive material layer pattern being formed to provide the inductor and the first capacitor plate and the second capacitor plate forming a resonance circuit with the first capacitor plate and the second capacitor plate positioned inside the inductor, and further comprising a step of cutting the dielectric foil material along part of a circumference of the first capacitor plate and the second capacitor plate to provide a cut-free capacitor and folding the cut-free capacitor away from a position inside the inductor, thus leaving such part free for penetration of magnetic flux through the inductor, wherein the folding is performed to fold the cut-free capacitor to that side of the tag opposite that side on which the conductive material layer pattern is formed to provide the inductor.

8. Method of producing a resonance security tag in accordance with claim 3, said method comprising steps of providing the dielectric foil material with the conductive material layer pattern on the first side and the second side thereof, each said conductive material layer pattern being formed to provide the inductor and the first capacitor plate and the second capacitor plate forming a resonance circuit with the first capacitor plate and the second capacitor plate positioned inside the inductor, and further comprising a step of cutting the dielectric foil material along part of a circumference of the first capacitor plate and the second capacitor plate to provide a cut-free capacitor and folding the cut-free capacitor away from a position inside the inductor, thus leaving such part free for penetration of magnetic flux through the inductor, wherein the folding is performed to fold the cut-free capacitor to that side of the tag opposite that side on which the conductive material layer pattern is formed to provide the inductor.

9. Method of producing a resonance security tag in accordance with claim 4, said method comprising steps of providing the dielectric foil material with the conductive material layer pattern on the first side and the second side thereof, each said conductive material layer pattern being formed to provide the inductor and the first capacitor plate and the second capacitor plate forming a resonance circuit with the first capacitor plate and the second capacitor plate positioned inside the inductor, and further comprising a step of cutting the dielectric foil material along part of a circumference of the first capacitor plate and the second capacitor plate to provide a cut-free capacitor and folding the cut-free capacitor away from a position inside the inductor, thus leaving such part free for penetration of magnetic flux through the inductor, wherein the folding is performed to fold the cut-free capacitor to that side of the tag opposite that side on which the conductive material layer pattern is formed to provide the inductor.

*     *     *     *     *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,495,566 B2                    Page 1 of 2
APPLICATION NO. : 10/582771
DATED              : February 24, 2009
INVENTOR(S)      : Poul Richter Jørgensen

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page,

Item (54) "RESONANCE SECURITY TAG WITH AND METHOD OF

PRODUCING SUCH A TAG"

should read

-- RESONANCE SECURITY TAG AND METHOD OF PRODUCING

SUCH A TAG --.

Item (86) "§ 371 (c)(1), (2), (4) Date: **Jun. 13, 2006**"

should read -- § 371 (c)(1), (2), (4) Date: **July 26, 2006** --.

Column 1,

Lines 1 and 2, "**RESONANCE SECURITY TAG WITH AND METHOD OF

PRODUCING SUCH A TAG**"

should read

-- RESONANCE SECURITY TAG AND METHOD OF PRODUCING

SUCH A TAG --.

Column 3,

Line 23, " $M12=K12\sqrt{S2}\,L2$ and $M23=K23\sqrt{S2}\,L2$   (3) "

should read -- $M12=K12\sqrt{S2}\,L2$ and $M23=K23\sqrt{S2}\,L2$   (3) --.

Line 28, " $Vm=K12\,K23\,(V1/L1)\,(\omega_0 L2/\eta S2 = K*Q*S$ "

should read -- $Vm=K12\,K23\,(V1/L1)\,(\omega_0 L2/\eta S2 = K*Q*S$ --.

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.           : 7,495,566 B2                                    Page 2 of 2
APPLICATION NO. : 10/582771
DATED                   : February 24, 2009
INVENTOR(S)        : Poul Richter Jørgensen

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Line 37, "proportional to Q*S" should read -- **proportional to Q•S** --.

Signed and Sealed this

Ninth Day of June, 2009

*John Doll*

JOHN DOLL
*Acting Director of the United States Patent and Trademark Office*